UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Aissatou DIALLO,<br><br>                        Petitioner,<br><br>-against-<br><br>William JOYCE, New York Field Office Director, Immigration and Customs Enforcement, U.S. Department of Homeland Security; Kristi NOEM, Secretary, U.S. Department of Homeland Security,<br><br>                        Respondents. | 25-CV-9909 (AS)<br><br>OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

Two days before Thanksgiving, Aissatou Diallo tried to fly to Texas to visit family for the holiday. The government had other plans.

Diallo is a 52-year-old woman from Guinea. While she is subject to an order of removal from back in 2012, the immigration judge on her case withheld her removal to Guinea, based on proof that she would be persecuted there based on her gender and politics. Today, no one argues that she poses any risk of flight or any danger to the community. She's lived peacefully in this country, is married to a United States citizen, has a son living here, and has a large family of nieces, nephews, and cousins in New York. Indeed, Diallo's I-130 petition was granted by immigration authorities in 2018, the first step in the process to gain lawful permanent resident status. Diallo lives in Queens, has legal authorization to work, and is employed as a home health aide. Over the past thirteen years, the government has made no effort to remove Diallo from the country and has no place to send her to.

Fast forward to November 25, 2025. Without any notice, Diallo was taken out of the security line at LaGuardia Airport, arrested, and shipped off to Louisiana to be detained there until the government can find a country to send her to. How long will that process take? The government has no idea. 12/5/25 Hearing Tr. at 25:3–5. Months or years perhaps. At the hearing on her habeas corpus petition on December 5, 2025, Diallo appeared in a courtroom sullen and scared, in prison garb, and shackled.

None of this had to happen. All of it is illegal. At the hearing, the Court granted Diallo's petition and ordered her released. This opinion explains why. For the reasons stated at the hearing and further below, Diallo's petition is GRANTED, and the government may not detain Diallo for any immigration-related reason absent further order of this Court.

## DISCUSSION

To lawfully detain Diallo, the government had to act pursuant to its statutory authority, in compliance with its own regulations, and consistent with the United States Constitution. It didn't do any of these things.

### I. Diallo's Detention Had No Statutory Basis

The government's sole authority for Diallo's detention is 8 U.S.C. § 1231. Hearing Tr. at 12:5–11; *see also Johnson v. Guzman Chavez*, 594 U.S. 523, 542–44 (2021) (holding section 1231 governs the detention of those with final removal orders). But that statute provides no basis for Diallo's detention thirteen years after her removal order became final.

Section 1231 provides that during a specified ninety-day removal period, "the Attorney General shall detain the alien." *Id*. § 1231(a)(1)(A), (a)(2)(A).[1] That removal period began when Diallo's removal order became administratively final, *id*. § 1231(a)(1)(B)(i), which no one disputes happened in 2012. After that period ended, section 1231 is clear about what happens next—"If the alien . . . is not removed within the removal period, the alien, pending removal, *shall be subject to supervision* under regulations prescribed by the Attorney General." *Id*. (a)(3) (emphasis added). No one disputes that this means that under normal circumstances, after the ninety-day removal period ends, a person is required to be released from detention under supervision. Under the current regulatory regime, that person would be released with an order of supervision, with regulations specifying conditions under which they can be re-detained. *See* 8 C.F.R. § 241.4.

That much is clear. But Diallo was *never* detained during the removal period, and she was *never* given an order of supervision at the end of it. The government's lawyer had no explanation for why. Hearing Tr. at 19:8–13. Of course, one potential explanation is that having been granted withholding of removal, the agency back in 2012 may have reasonably thought that Diallo's immigration case was over, and that she would remain in this country, more or less permanently.

But whatever the explanation, Diallo doesn't fall within either section 1231's detention provisions, or 8 C.F.R. § 241.4(*l*)'s provisions regarding re-detention of people subject to administrative orders of supervision. (As discussed below, the government didn't follow those regulations anyway.)

Diallo says that this is the end of the story. The government can't detain anyone it wants. It needs a statutory basis to arrest and detain people, and it doesn't have one here. The government, on the other hand, says that ICE has the authority to detain a person subject to a final removal order "regardless of when ICE detains the individual" and "regardless of whether she was previously detained during the 90-day removal period." Dkt. 17 at 1. It points to section 1231(a)(6) for this broad authority. This provision states that "[a]n alien ordered removed who is inadmissible under section 1182 of this title . . . may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)." Back in 2012, Diallo was ordered

---

[1] All citations to statutes are to Title 8 of the United States Code, unless otherwise noted.

removed based on her inadmissibility under section 1182, and so the government argues that section 1231(a)(6) provides the basis for her detention now.

The government's argument is wrong. Section 1231(a)(6) provides for a period of *continued* detention for certain classes of people who have not been removed at the conclusion of the ninety-day removal period. It isn't a free-roaming right to arrest and detain people any time it sees fit, even a decade after the fact. That's clear from the text of section 1231, which defines the ninety-day removal period, *see id.* § 1231(a)(1)–(2), and then says that for individuals in Diallo's situation, they "may be detained *beyond* the removal period," *id*. § (a)(6) (emphasis added), indicating that a detention during the removal period may be extended "beyond" that period. This understanding reflects the longstanding view of the Supreme Court, the United States, and immigration authorities themselves about how section 1231(a)(6) works. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 683 (2001) ("After entry of a final removal order and during the 90–day removal period, however, aliens must be held in custody. § 1231(a)(2). Subsequently, as the post-removal-period statute provides, the Government 'may' *continue to detain* an alien who remains here or release that alien under supervision. § 1231(a)(6)." (emphasis added))[2]; Brief for Petitioners at 21, *Ashcroft v. Ma*, 533 U.S. 678 (2001) (No. 00-38), 2000 WL 1784982, at *21 ("The plain language of Section 1231(a)(6) thus vests the Attorney General with the authority to *continue an alien in detention* beyond the removal period . . . ." (emphasis added)); Continued Detention of Aliens Subject to Final Orders of Removal, 66 Fed. Reg. 56967-01, 2001 WL 1408247 (Nov. 14, 2001) ("After expiration of the removal period, section [1231(a)(6)] of the Act grants authority to the Attorney General to *continue the detention* of . . . [a]ny inadmissible alien . . . ." (emphasis added)).

Further textual evidence supports this reading. Section 1231(a)(6) says that a person "may be detained beyond the removal period *and, if released*, shall be subject to the terms of supervision in paragraph (3)." (Emphasis added.) The "and, if released" language reflects that section 1231(a)(6) applies to people who are already in detention, as they would be during the 90-day removal period. Nothing in this provision suggests the arrest and detention of people anew, long after the removal period has concluded. And such a reading would lead to anomalies. The conditions of supervision, including re-detention, of people released under section 1231 is governed by a different part of the statute, subsection (a)(3), which provides that "the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." *See* § 1231(a)(6) (confirming that "if released, [the alien] shall be subject to the terms of supervision in paragraph (3)"). But on the government's reading, anyone matching the categories in 1231(a)(6)—which broadly applies to, among others, anyone inadmissible under section 1182—can be arrested and detained at any time, for any reason or no reason at all, regardless of any terms of supervision or regulations prescribed by the Attorney General. This would override section 1231(a)(3) for vast numbers of people within that provision's scope. Nothing in section 1231 suggests this result.

---

[2] The provision cited in *Zadvydas* as section 1231(a)(2) is now at section 1232(a)(2)(A) following more recent amendments.

3

The relevant regulations also support Diallo's reading of section 1231(a)(6). 8 C.F.R. § 241.4—which by its text purports to operationalize section 1231(a)(6)—is titled "*Continued* detention of inadmissible, criminal, or other aliens beyond the removal period," (emphasis added), and repeatedly refers in its text to the decision to "continue an alien in custody." 8 C.F.R. § 241.4(a). Further, the regulations are replete with evidence that the period for detention under section 1231(a)(6) runs from the end of the ninety-day removal period, including, for example, the requirement that "[p]rior to the expiration of the removal period," a custody review be conducted and the person be informed whether they will be "continued in detention," so that they may challenge that determination. 8 C.F.R. § 241.4(k)(i); *see also* § 241.4(f) (outlining the "factors that should be weighed in considering whether to recommend *further* detention or release" (emphasis added)); 241.4(h)(4) (requiring a "district director" conducting a custody review to "notify the alien in writing that he or she is to be released from custody, or that he or she will be *continued* in detention" (emphasis added)); § 241.4(i) (governing decisions by an Executive Associate Commissioner to "release or *retain* custody" (emphasis added)); *cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024) ("An agency's interpretation of a statute 'cannot bind a court,' but may be especially informative 'to the extent it rests on factual premises within [the agency's] expertise.'" (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98 n.8 (1983)).

Against all of this, the government points to *Zadvydas* as purportedly holding that section 1231(a)(6) authorizes detention whenever it is "reasonably necessary" to effectuate a person's removal from the United States. Dkt. 17 at 3. It doesn't. *Zadvydas* dealt with a different question: how long *following* the ninety-day mandatory detention period can a person be detained under section 1231(a)(6); in that context the Court made clear that indefinite detention isn't authorized, but rather that it's limited to the period reasonably necessary to effectuate the person's removal. 533 U.S. at 682. But in terms of *when* section 1231(a)(6) kicks in, the Court took as a given that it follows immediately after the ninety-day removal period. *Id.* (noting section 1231(a)(6) "authorizes *further* detention *if* the Government fails to remove the alien during those 90 days" (emphasis added)); *id.* at 683 (noting that during the removal period, a person must be held in custody, and "[s]ubsequently, as the post-removal-period statute provides, the Government 'may' *continue* to detain an alien" (emphasis added)).

The government's other authorities are also unpersuasive. Cases like *Lin v. United States*, 2007 WL 951618 (S.D. Tex. Mar. 28, 2007), *Callender v. Shanahan*, 281 F. Supp. 3d 428 (S.D.N.Y. 2017), *Jiang v. Bondi*, 2025 WL 3281819 (D.N.M. Nov. 25, 2025), and *Piao v. Lyons*, 2025 WL 3046783 (E.D. Va. Oct. 31, 2025), largely assumed that section 1231(a)(6) permitted the detention of people at any time and regardless of whether they had been initially detained during the removal period, and focused on a separate question that isn't at issue here—whether the limitation on such detention imposed by *Zadvydas*, including its suggestion of a six-month time limit, is measured from when the removal period started, or rather from when they were later detained. *See Lin*, 2007 WL 951618, at *3; *Callender*, 281 F. Supp. 3d at 435–36; *Jiang*, 2025 WL 3281819, at *2; *Piao*, 2025 WL 3046783, at *3.

4

To the extent those cases gesture at the construction of section 1231, the Court disagrees that "there is nothing in § 1231 to indicate that the Attorney General cannot enforce those removal orders 'late,'" *Lin*, 2007 WL 951618, at *3, that the law is "silent on *when* the government's power to detain aliens ordered removed must be exercised," or that "the government's failure to detain the Petitioner during the removal period or immediately thereafter does not eliminate the Government's ability to detain Petitioner for the purpose of enforcing that removal order at this time," *Piao*, 2025 WL 3046783, at *2. This isn't an issue of mere timing. Rather, it's a question of what arrest and detention authority Congress provided to the Executive Branch in section 1231. As addressed above, the statute provides for a limited, ninety-day period of mandatory detention authority, and it is clear about when that period begins and ends. Section 1231 then provides for a period of discretionary continued detention following that period for certain classes of people, to the extent necessary to facilitate their removal. Otherwise, it provides that those subject to final orders of removal, but who aren't removed, will be released on supervision, and that the terms of their supervision and re-detention will be governed by regulation. What it doesn't do is authorize a right to arrest and detain people at any time, for any or no reason.

The government's only other case is *Nielsen v. Preap*, 586 U.S. 392 (2019). That case didn't address section 1231, but rather an entirely separate question under a different statute—the class of individuals subject to mandatory detention under section 1226(c). And while the government argues that *Nielsen* stands for the general proposition that timing provisions in statutes don't matter, the language that the government relies on (1) addresses the specifics of section 1226(c)'s text, and not section 1231's requirements, and (2) comes from a portion of *Nielsen* that garnered only three votes, and doesn't constitute the majority's holding, which was decided on separate grounds. Dkt. 17 at 7–9 (citing and quoting *Nielsen*, 586 U.S. at 411–12).

The government argues generally that Diallo's reading "would lead to the absurd result that only noncitizens who were actually detained during the removal period (section 1231(a)(2)), and then subsequently released on an order of supervision (section 1231(a)(3)), could ever be subject to discretionary detention under section 1231(a)(6)." Dkt. 17 at 6. That outcome isn't absurd. To be clear, nothing in the Court's holding says that the government may not remove Diallo or that, if removal were *imminent*, the government could not briefly detain Diallo for purposes of effecting that removal. A detention of that kind might reasonably be thought of as implicit in the concept of "removal" itself. That's not this case, where the government concedes that it has no idea (1) whether removal is possible given Diallo's withholding of removal to Guinea, (2) where it could remove her to, and (3) when that might happen. The Court also has no view as to whether the government could impose an order of supervision on Diallo *now* that could subject her to potential detention, assuming the government followed the regulations. No one disputes that there isn't any order of supervision at this time, and contrary to the government's suggestion, it would be improper for the Court to make an advance ruling about such a possibility. *See* Dkt. 17 at 9–10.

But more importantly, detention is the exception, not the norm. As the Court in *Zadvydas* itself observed, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process] Clause protects." 533 U.S.

5

at 690. Given this fundamental liberty interest, there is nothing "absurd" in requiring the government to strictly adhere to statutory requirements when attempting to arrest and detain people. The government failed to do so here.

## II. In Any Event, Diallo's Detention Violated Her Due Process Rights

Even if section 1231 provided a statutory basis to arrest and detain Diallo, the government nevertheless violated her procedural due process rights by detaining her without any notice or the opportunity to be heard.

Courts in this Circuit have recognized that "the Due Process Clause gives the noncitizen procedural rights in connection with the decision to deprive them of liberty." *Funes v. Francis*, 2025 WL 3263896, at *21 (S.D.N.Y. Nov. 24, 2025); *accord E.M.M. v. Almodovar*, 2025 WL 3077995, at *3–5 (S.D.N.Y. Nov. 4, 2025); *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 157 (W.D.N.Y. 2025); *Lopez Benitez v. Francis*, 2025 WL 2371588, at *9 (S.D.N.Y. Aug. 13, 2025); *Chipantiza-Sisalema v. Francis*, 2025 WL 1927931, at *3–4 (S.D.N.Y. July 13, 2025); *see also Addington v. Texas*, 441 U.S. 418, 425 (1979) ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.").

Relatedly, the Supreme Court has recognized that "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *accord Singh v. U.S. Dep't of Just.*, 461 F.3d 290, 296 (2d Cir. 2006) ("[A]n administrative agency must adhere to its own regulations."). Indeed "[t]he notion of fair play animating [the Fifth] [A]mendment precludes an agency from promulgating a regulation affecting individual liberty or interest, which the rule-maker may then with impunity ignore or disregard as it sees fit." *Montilla v. I.N.S.*, 926 F.2d 162, 164 (2d Cir. 1991).

If section 1231 authorized Diallo's detention and an implementing regulation were to apply to her situation, the government says that "the closest analog would be where . . . an order of supervision was imposed and is being revoked," that being 8 C.F.R. § 241.4(*l*) (titled "Revocation of release"). Hearing Tr. at 21:6–8. There are two ways that the government can revoke release and detain someone under that regulation. Under both, the person is "entitled to notice of the reasons for the revocation of her release and an informal interview promptly after her return to custody that afforded her an opportunity to respond to the reasons for revocation stated in the notification." *Funes*, 2025 WL 3263896, at *17 (cleaned up); *accord*, *Zhu v. Genalo*, 2025 WL 2452352, at *6 (S.D.N.Y. Aug. 26, 2025); *Ceesay*, 781 F. Supp. 3d at 162–64. But the government doesn't claim that Diallo received either. Indeed, when asked at oral argument whether Diallo "receive[d] the notice and prompt interview required by 8 C.F.R. § 241.4(*l*)," its counsel responded, "I'm not aware of her having received that." Hearing Tr. at 21:14–16.

Alternatively, the government argues that while section 1231 applies to Diallo, the procedural safeguards in the regulations implementing the statute don't. Hearing Tr. at 20:12–15. ("Some of the provisions concerning revocation of an order of supervised release do not directly apply because [Diallo] was not subject to an order of supervised release."). There's no basis for the government's topsy-turvy view of the legal framework governing detention.

First off, it defies common sense to broadly read section 1231 to authorize Diallo's detention even though she was never previously detained nor given any order of supervision, but to deprive her of the procedural safeguards that someone like Diallo would have if the government had only followed its own legal mandates.

But even if the regulatory requirements don't apply to Diallo by their own terms, those protections would still be required by the Due Process Clause. *See Zhu*, 2025 WL 2452352, at *9 n.4. In *Zhu*, the court applied the three-factor balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which "[c]ourts in this Circuit apply . . . in determining the adequacy of process in the civil immigration context." *Id.* The court held that "the private interests at stake are significant and weigh in Petitioner's favor, since the private interest affected is Petitioner's interest in being free from imprisonment, especially since he has not violated any condition of his supervised release and was dutifully reporting under his supervision requirements." The court then said "the 'risk of an erroneous deprivation' and the 'probable value, if any, of additional or substitute procedural safeguards' also weigh in Petitioner's favor, since 'the almost nonexistent procedural protections' provided to Petitioner 'markedly increased the risk of an erroneous deprivation of [his] private liberty interests.'" *Id.* (first quoting *Mathews*, 424 U.S. at 335; then quoting *Black v. Decker*, 103 F.4th 133, 152 (2d Cir. 2024)) (internal citations omitted). On the third factor, the court acknowledged that "the Government's interests, presumably in effectively carrying out orders of removal, are legitimate, but would not be undercut by additional procedural safeguards as minimal as notice and an informal interview—a conclusion reinforced by the fact that the Government seems to provide these processes in the normal course when it redetains other noncitizens pursuant to 8 C.F.R § 241.4(*l*)(2)." It then concluded that "Petitioner was entitled to at least notice and an informal interview in connection with his redetention" and ordered his release.

That analysis equally applies here. Diallo has an interest in being free from imprisonment, and she was afforded no procedural protections before the government detained her, increasing the risk of an erroneous deprivation of her liberty. Indeed, these risks are at their apex in this case, where Diallo was arrested and detained for no discernable reason, with no identified risk of flight or danger, no prior outreach, and with no country identified that she could even be sent to. It also wouldn't undercut the government's interests to require it to provide Diallo with the same minimal procedural safeguards that it must provide before re-detaining people who, *unlike* Diallo, violate their conditions of release. Diallo's arrest and detention without following these basic procedures plainly violated her due process rights. In *Zhu*, as here, the "typical remedy" for "unlawful executive detention . . . is, of course, release." *Munaf v. Green*, 553 U.S. 674, 693 (2008); *see also Funes*, 2025 WL 3263896, at *25 (collecting cases ordering release after finding due-process violation from failure to follow section 241.4(*l*)). The government disputes that remedy but provides no case holding otherwise. The Court sees no reason to depart from the typical remedy in the absence of such authority. Dkt. 11 at 9.

## CONCLUSION

The government's actions leading up to this case were not only illegal, they were inhumane. And they aren't unique to this case. This district has been flooded with petitions for relief with similar stories—families ripped apart, and people who pose no danger or risk of fleeing imprisoned with no end in sight, flown to far off detention centers for reasons that the government lawyers who appear in court themselves can't explain. *See, e.g.*, Hearing Tr. at 5:17-19 (Q: "How did ICE decide to detain Ms. Diallo on November 25th?" A: "I don't know."); 6:10–12 (Q: "What notice and opportunity to be heard was Ms. Diallo given when she was detained?" A: "I don't know."); 27:9–12 (Q: "Do you know why the agency moved Ms. Diallo right around Thanksgiving to be incarcerated in[] Louisiana?" A: "I don't know . . . ."). The same thing is happening daily all around the country. And that doesn't account for the countless people picked up off the streets who don't have lawyers and who can't effectively seek relief.

No one disputes that the government may, consistent with the law's requirements, pursue the removal of people who are in this country unlawfully. But the way we treat others matters. Disregarding the law—not to mention common human decency—in the way the government has done in this case, exacts a severe human and societal toll, to say nothing of the tremendous economic burden on the American taxpayer, who foots the bill for the needless and indeterminate incarceration of people like Diallo. We can and must do better.

So, for the reasons set forth above, Diallo's petition is GRANTED, and the government may not detain her for any immigration-related reason absent further order of this Court.

SO ORDERED.

Dated: December 23, 2025
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge